**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| JAMILAH PERRY, | : | Bankruptcy No. 06-14777DWS |
| aka Jamilah Lawrence, | : | |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the (1) Debtor's Motion to Amend Plan Post-Confirmation ("Modification Motion") and (2) Motion for Relief from Stay ("Relief Motion") filed by Countrywide Home Loans, Inc. ("Countrywide"). Also pending is the Chapter 13 trustee's (the "Trustee") motion to dismiss ("Dismissal Motion") for lack of timely payments which has been carried since October 25, 2007. A consolidated hearing was held on January 10, 2008.[1] Both the Trustee and Countrywide oppose the Modification Motion. For the reasons that follow, the Modification Motion is denied, and the Chapter 13 case is dismissed. Accordingly, the Relief Motion is moot.

---

[1] Also consolidated with the foregoing contested matters was the Motion for Relief from Stay filed by JP Morgan Chase Bank as servicer for Popular Mortgage ("Popular"). However, rather than seek a ruling on its motion, Popular requested a continuance to determine whether a proposed settlement had been reached with respect to the post-petition arrears on this mortgage loan. It appears that a new lawyer has become involved for Popular and the ball may have been dropped in presenting the reported stipulation. Further proceedings were scheduled for January 22, 2008 but are also now moot in light of the subsequent dismissal.

**BACKGROUND**

Debtor, the owner of multiple residential properties, filed this Chapter 13 case on October 18, 2006.[2] Before the meeting of creditors could be held, Popular and Countrywide objected to her Chapter 13 plan, and the mortgagee on one of properties received stay relief by default. Doc. Nos. 23, 24 and 27. The Trustee's first motion to dismiss was filed on February 2, 2007 for failure to file documents. Doc. No. 32. An amended plan was filed March 5, 2007 on the eve of her continued confirmation hearing, setting into motion what has become a pattern in this case, i.e., the filing of a deficient plan, the objections of creditors and the Trustee thereto followed by the Debtor's request to file a further plan, usually on the eve of the continued confirmation hearing and Trustee's motion to dismiss. The first amended plan was objected to, and the second amended plan was filed on April 23, 2007. Doc. No. 41. That plan being objected to, another continuance was granted to file a further plan, and the Third Amended Plan was filed on May 1, 2007. Doc. No. 49. That plan also being objected to, another continuance was granted, and the Fourth Amended Plan was filed on May 25, 2007. Doc. No. 49. The pattern was repeated again with a Fifth

---

[2] I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995) (*citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules). Moreover, "factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them. Larson v. Gross Bank, 204 B.R. 500, 502 (W.D. Tex. 1996) (statements in schedules). See also In re Musgrove, 187 B.R. 808 (Bankr. N.D. Ga. 1995) (same); In re Leonard, 151 B.R. 639 (Bankr. N.D.N.Y. 1992) (same).

Amended Plan filed on July 3, 2007 and also objected to. Doc. No.'s 53 and 57. Finally the Sixth Amended Plan (the "Confirmed Plan"), filed on July 27, 2007, was confirmed on August 9, 2007. Doc. No. 54.

The Confirmed Plan, Exhibit T-1, provided that the Debtor would pay $100 to the Trustee for twelve months, make a lump sum payment of $15,000 on or before September 1, 2007 and thereafter make payments of $405 per month for the final 48 months of the plan. The Debtor committed (1) to sell at least one of her properties, beginning with a property located in Darby, Pennsylvania with net proceeds projected of "at least $15,000" to be paid to the Trustee, and (2) to remain current with post-petition mortgage payments due on all the mortgages on properties that were not sold. Her other properties consist of her residence at 1062 Ash Road, Sharon Hill, PA (the "Residence"), and rental properties at 509 Macdade Boulevard, Collingswood, PA ("Macdade"), 1011 Pine Road, Sharon Hill, PA ("Pine") and 63 Foster Ave., Sharon Hill, PA ("Foster").

Debtor testified that she is current on her Residence mortgage but acknowledges being four months delinquent on the Macdade mortgage held by Popular, the Pine mortgage held by Countrywide and the Foster mortgage held by Saxon Mortgage ("Saxon").

With respect to the payment obligations under the Confirmed Plan, Debtor made an almost timely lump sum payment from her sale of the Darby property but the amount was only $12,000, not the committed $15,000. Her response to this default of her Plan and the Trustee's renewed motion to dismiss filed October 1, 2007, Doc. No. 78, was to file another plan and the Modification Motion on October 9, 2007, Doc. No. 82, the intent which

was to increase plan payments to make up the insufficiency in the lump sum payment. The plan that supported that motion, i.e., the Seventh Amended Plan, was filed on October 15, 2007, Doc. No. 86, shortly before the Trustee's dismissal motion was scheduled to be heard. Contemporaneously Countrywide, Popular and Saxon[3] filed motions for relief from stay for failure to make post-petition mortgage payments. The hearings on all these pending matters were set for November 15, 2007 but on the eve of the hearing Debtor again filed an amended plan, nominally the Second Revised Seventh Amended Plan, and as it was still deficient, withdrew it at the November 15 hearing with a commitment to file an Eighth Amended Plan and amended Schedules I and J in support thereof. The Eighth Amended Plan was filed on November 21, 2007 proposing to pay $763 monthly to the Trustee beginning December 1, 2007 and include in the plan all the post-petition arrears to be paid to the complaining mortgagees over the remaining life of the plan. However, when Popular balked, a Ninth Amended Plan was filed reducing the monthly payment to the Trustee to $672 in order to pay Popular two of the four missed payments directly over six months rather than over the remaining 47 months of the plan.[4] The evidentiary hearing on the Modification

---

[3] The Saxon motion was settled with a promise of a stipulation to be filed. Doc. No. 104. However, none has been filed to date, and Debtor acknowledges not making payments on account of the Saxon mortgage.

[4] While Debtor testified that she made a December payment to Popular, it was not in the increased amount. She claimed she didn't know what the increase would be since Popular had not advised her. I find this explanation disingenuous since the increase was simply two payments divided by six months, i.e., $1,428 x 2= 2,856÷6=$476. Debtor had no difficulty calculating the increased plan payments when she put all the arrears in the plan. The same exercise would have easily yielded the amount of the increased mortgage payment. Moreover, had the calculation been
(continued...)

Motion proposing the Ninth Amended Plan and the adjourned motions were held as stated on January 10, 2008.

The Ninth Amended Plan filed on January 10, 2008[5] provides that Debtor will pay the Trustee $672 for the remaining 47 months, which will satisfy all post-petition arrears to Countrywide and Saxon, and two of the four delinquent payments to Popular. It states that the source of these payments will be "real estate sales, in addition to rentals from her properties, and payments by a cleaning service." Exhibit D-1. It notes, "as an alternative" to maintaining post-petition mortgage payments on her properties, she "will consider" selling her Foster property as to which she acknowledges owing post-petition arrears of $4,345. When questioned at the hearing as to her intentions with respect to Foster, she revised her plan filed earlier that day to state that she now would sell Foster since values in the neighborhood had increased. She stated that she would sell it herself (she is a licensed real estate broker) beginning February 1 when she believed the market would begin to seasonably improve. Her sale price would be $155,000. The property is valued in her Schedule A at $95,000 with a mortgage of $93,800.

---

(...continued)
off, an adjustment could have been made thereafter.

[5] The December 13 hearing was continued on the representation that Debtor would file a further plan and amended Schedules I and J to support it. As noted it was filed on the same day as the continued hearing providing little to no opportunity to the Trustee whose attorney was engaged in other court hearings that day or the mortgagee's counsel to study it. While nominally intending to make the reduction in payments resulting from the Popular agreement, it made some other changes described below.

To substantiate her income to support her Ninth Amended Plan, she testified that she had recently secured tenants for all her rentable space and produced one year renewable leases evidencing the tenancies. Exhibit D-2. The following is the schedule of rentals that was presented:

```
Macdade Boulevard - lease 1: $675 as of September 1, 2007 (no deposit)
                  - lease 2: $740 as of September 1, 2007 ($1,505.00 deposit)
                  - lease 3: $740 as of December 1, 2007 ($864 deposit)
Pine Road         - lease -  $825 as of October 1, 2007 (no deposit)
Foster Avenue     - lease -  $1,300 as of October 1, 2007 ($2,625 deposit)
```

The current monthly income from the rental properties according to the leases is $4,280.[6]

Her total monthly expenses according to her amended Schedule J, Exhibit D-3, are $4,235.[7]

Notably her rental income is insufficient alone to cover her expenses and the proposed plan payment. According to her Schedule I, the difference and the ability to make a plan payment of $672 is provided by a $1,000 monthly payment from "a cleaning service." As evidence of this income, she produced a letter dated November 5, 2007 of Executive Cleaning Services, 1501E Patricia Drive, Yeadon, PA ("ECS") and signed by Maurice Haughton ("Haughton") who she identified as a friend she has known for a few years.

---

[6] She testified that her post-petition mortgage defaults were a result of the lack of rental income. However, when questioned by the Trustee, she could not explain why she had not paid any of the rental property mortgages before December 1 notwithstanding the income she derived from the properties beginning in September 2007. Morever a comparison of Exhibit D-2 and her Schedule G (Executory Contracts and Unexpired Leases) shows that the Pine Road tenant, Ortha Roberts, was already subject to a residential lease for this property on October 30, 2006.

[7] Actually her expenses are $476 higher as a result of the agreement with Popular to cure the two arrears payments of $1,428 over six months. See note 4 supra.

Exhibit D-5. She stated that she neither now or ever has provided services to ECS.

The letter, on plain paper without letterhead reads as follows:

Executive Cleaning Services
1501E Patricia Drive,
Yeadon, PA 19050

11/05/2007

(610) 626-9802

To Whom It May Concern:

This is to confirm that as the owner of the above names business and as associate of Jamilah Perry, I have committed to assist her financially in order to comply with the terms and conditions of the plan presented a the bankruptcy hearing on 11/06/2007.

I have read the plan and clearly understand the financial hardship that this will create for Ms. Perry, as a result I will contribute fifty percent of the amount proposed in the plan and ensure full payment each month.

I respectfully beseech the committee to consider granting the request to spread the balance owed over the length of time agreed upon.

Sincerely,

/s/
Maurice Haughton

Debtor stated that she has received two $1,000 payments to date from Haughton and claimed he had reviewed her most recent plan. No other information was provided about Haughton nor did she request him to appear to support the Modification Motion.

**DISCUSSION**

<u>A.</u>

Section 1329(a) authorizes the post-confirmation modification of a Chapter 13 plan,[8] thus tempering the established principle that confirmation of a plan is *res judicata* on all issues decided or could be decided under the plan. <u>In re Szostek</u>, 886 F.2d 1405, 1409 (3d Cir. 1989) (the binding effect of a chapter 13 plan extends to any issue actually litigated by the parties and any issue necessarily determined by the confirmation order, including whether the plan complies with sections 1322 and 1325 of the Bankruptcy Code). Section 1329(b) establishes a limit on such modifications by making §§ 1322(a), 1322(b), 1323(c) and 1325(a) applicable to any modification under section (a).

Section 1322(b)(5) is the statutory predicate for post-confirmation plan modifications to cure payment defaults, the proposed modification under consideration here. That section allows cure of "<u>any</u> default within a reasonable time and maintenance of payments while the case is pending on any ...secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5) (emphasis added). The absence of any temporal limitation in that section has been interpreted as permitting post-confirmation modifications of payment defaults. <u>Greentree Acceptance, Inc. v. Hoggle (In re Hoggle)</u>, 12 F.3d 1008, 1100 (11th Cir. 1994). <u>Accord Mendoza v. Temple-Inland</u>

---

[8] That section provides for modification in order to (a) increase or reduce the amount of payments on claims of a particular class provided for by the plan; (b) extend or reduce the time for such payments; (3) alter the amount of the distribution to a creditor provided for by the plan; and (4) reduce the amount to be paid under the plan by the amount expended for health insurance. 11 U.S.C. § 1329(a). While not expressly authorized, plan modification is also permitted to cure post-petition, post-confirmation payment defaults in appropriate circumstances as discussed below.

Mortgage Corp., 111 F.3d 1264, 1268 (5th Cir. 1997). The legislative history of §§ 1322(b)(5) and 1329 as well as Congress' intent to allow homeowners to utilize its flexible provisions for debt relief without sacrificing their homes" support this interpretation. Hoggle, supra.

Because of the competing policy favoring finality of Chapter 13 plans following the conclusion of the confirmation process, it is also clear that the ability to modify requires the proposed modified plan to cure defaults within a reasonable time while regular payments are maintained. This factor emanates from the express language of § 1322(b)(5) incorporated by § 1329(b). Hoggle, 12 F.3d at 1012. Whether the time proposed is reasonable is left to the discretion of the court and will vary with the facts of the case. Union Planters Bank, N.A. v. Bunnell (In re Bunnell), 2003 WL 24241626, at *4 (Bankr. S.D. Ga. Nov. 20, 2003). However, as a general rule, reasonableness should bear some relation to the degree of the post-petition default and the amount of equity in the underlying property. Id. See also In re Ford, 84 B.R. 40, 43 (Bankr. E.D. Pa. 1988) (considering post-petition payment default prior to confirmation). It also necessarily follows that since the proposed modification must satisfy the applicable standards for confirmation, it must be proposed in good faith and the modified plan must be feasible. In re Nalls, 2007 WL 988039, at *3 (Bankr. N.D. Ala. May 7, 2007); Bunnell, supra; In re Binder, 224 B.R. 483, 488 (Bankr. D. Colo. 1998).

Finally, it is generally viewed that the default that occasions the need for modification must have been caused by circumstances that could not have been foreseen at confirmation. Support for this requirement is found in the legislative history of § 1329 and the respect accorded the principle of *res judicata*. Hoggle, 12 F.3d at 1011 ("Congress designed § 1329

to permit modification of a plan due to changed circumstances of the debtor unforeseen at the time of confirmation."). I had occasion to address this requirement in In re Gallagher, 332 B.R. 277, 281, 282 (Bankr. E.D. Pa. 2005) and likewise concluded that some change of circumstance is required to justify modification and the concomitant impairment of the reasonable expectations of creditors bound by the confirmed plan. I was not required to articulate the quantum of change necessary to support a post-confirmation modification in that case nor must I do so here. However, it is clear to me that modification which simply rolls post-confirmation arrears into the plan balance without a change of circumstance is generally not appropriate to cure post-petition defaults.[9]

## B.

Applying these standards to the proposed modification compels rejection of the Modification Motion. Debtor neither has the will nor the resources to perform the yet further amended plan. Plan amendments have become Debtor modus operandi for resisting the

---

[9] Some courts require a debtor to demonstrate a substantial, unanticipated change of circumstance in order to overcome the *res judicata* effect of a confirmed plan with plan modification. In re Meeks, 237 B.R. 856, 859 (Bankr. M.D. Fla. 1999) (*citing* cases and rejecting that view). However, the majority appear to conclude, as did Meeks, that the debtor need not demonstrate a substantial, unanticipated change of circumstance in order to modify a confirmed plan but neither can Chapter 13 debtors simply modify their plans "willy nilly," nor should modifications be granted routinely. Id. at 858-60. E.g., In re Lynch, 109 B.R. 792, 796 (Bankr. W.D. Tenn. 1989) (*citing* cases).

A common strategy employed by some debtor's counsel when their clients are in arrears to the Chapter 13 trustee is to file a preemptive plan modification addressing the pending Trustee's motion to dismiss for lack of timely payments by adding the arrearage to the plan amount and increasing the monthly payment to amortize the arrears over the remaining life of the plan. Absent some change of circumstance that would justify allowing an increased payment when the debtor had been incapable of making the original payment, this simply is not a cure. To the extent debtors respond to the trustee's motion to dismiss in this mechanical manner, I have not allowed the modification which prejudices creditors by merely delaying the inevitable.

-10-

Trustee's motions that address her failure to perform the payment obligations under her various plans. In the thirteen months of the plan term to date, Debtor has paid the Trustee less than $2,000 from her regular income. Exhibit T-3. During the many months of pre-confirmation hearings, she explained that she was in the process of securing her real estate broker's license and sought and obtained a reduced plan obligation of $100 per month pending her ability to sell property on her own behalf and generate commissions. Notably her latest plans have not relied on her income as a broker. Indeed her amended Schedule I shows no income from this source. Furthermore, her plans have always suggested that she would sell property <u>as needed</u> to close the gap between her income and the necessary plan funding. While only committing to sell Darby, she has been encouraged by the court to go further since her income is clearly insufficient. She sold the Darby property but has taken no steps to liquidate any other parcel. Rather she has retained her other investment properties and accumulated more arrears by failing to pay post-petition mortgage payments. Even now, when her case is in jeopardy, her proposed Ninth Amended Plan merely states that she will "consider" selling the Foster property.[10] Based on her testimony on this point and her past

---

[10] Perhaps recognizing at the contested hearing that she was not going to sail through these motions without more, she states that she will put the Foster property up for sale on February 1 for $155,000, a sum I note is far in excess of the value she placed on her Schedule A. This alteration of the plan filed on the same date as her testimony emanates from her sudden view that the property values in the neighborhood have increased not that she has any need to sell to make her plan work. Since Debtor has a tenant in the property and is not paying the Foster mortgage (nor has she provided for it in the amended plan) and Saxon, the Foster mortgagee has apparently lost track of this case (see n.3 supra), she simply has no incentive to sell this property to make her plan work. If anything, her sale motive is inextricable linked to her expectation of a large purchase price. Given Debtor's prior assurance that she would contribute the net proceeds from the sale of Darby to be "at least $15,000," I must discount Debtor's self-serving testimony about a sale of Foster.

-11-

performance of similar commitments, I put no stock in that proffer[11] and conclude that a future sale is just another red herring to maintain bankruptcy protection against her unpaid mortgagees.

Debtor is in default of her Confirmed Plan not merely because the committed $15,000 from the sale of Darby was short by $2,000 but more significantly because she has not paid any of the mortgages on her investment properties for four months nor made the stepped up payment to the Trustee as of September 1. While the Darby payment default could be an unforeseen change of circumstance that would justify a modification, the failures to pay her current mortgages and the Chapter 13 trustee the increased plan payment are not. Debtor's explanations for not doing so are simply not credible. With respect to post-petition mortgage payments, Debtor contends that she was unable to remain current because she had lost her rental income. She proffers new leases for the properties to support the alleged change of circumstance that she avers will enable her to remain current.[12] As noted by the Chapter 13 trustee, those leases commenced for the most part in September and October yet Debtor made no current mortgage payments with this income. If her testimony is to be believed, she had $1,415 from the MacDade Boulevard tenants as of September 1 and an

---

[11] Indeed the sincerity of this expressed intention is undercut by her entry as of October 1 into a year lease with a two month deposit for the Foster property.

[12] Notably the Pine Road lease is with the same tenant that occupied the property on October 30, 2006, the date Debtor's Schedules were filed. It is hard to imagine that in the period of one year the tenant would have moved out and returned to the same property. More likely the lease is a renewal and the not an agreement with a new tenant.

additional $2,125 from the Pine Road and Foster Avenue tenants as of October 1.[13] Since she could not explain why she did not use that income to stay current on her mortgages, I must conclude that she either did not have it or used it for more pressing needs given the protection she had from her mortgagees in this case.  Her past conduct is the best indicator of future performance that can be expected.

Likewise her failure to pay the Trustee as committed under the Confirmed Plan either evidences a lack of funds to do so or a cavalier attitude towards her obligations in this case. The Confirmed Plan clearly provides that Debtor shall pay $100 monthly for twelve months, a lump sum payment of $15,000 on or before September 1, 2007, "and thereafter payments of $405 for the final 48 months of the plan from income obtained from her employment as a real estate salesperson." Exhibit T-1.  The Trustee's report shows the following payments under the Confirmed Plan: $100 on August 29; $12,000 and $100 on September 18; $100 on October 23 and $291 and $472 on November 21, 2007.  No payments have been recorded since November 21.  The Debtor contends that the $763 payment was made in December to comply with the proposed Amended Eighth Plan.  If the two November 21 payments were intended as the December payment, no November payment of $405 was made and the October payment was $305 short.  As Debtor was allegedly receiving rental income during this period and not paying her mortgagees, Debtor should have had the funds to pay the Trustee.  However, Debtor offers no explanation for her noncompliance other than

---

[13] This is without regard to the deposit money of $4,130 she then received which she may or may not have held in escrow.

-13-

suggesting that given the pendency of her attempt to modify, she did not have to comply with her Confirmed Plan. Rather Debtor seeks to remedy non-compliance with the Confirmed Plan by rolling these deficiencies into the proposed Ninth Amended Plan and providing for payments of $672 commencing January 2008 forward. This aspect of the modification, under Debtor's rationale, would make those arrears magically disappear as well. As I have noted above, I do not approve of these arithmetic paper cures of plan defaults. They demonstrate disrespect for the legislatively balanced Chapter 13 process that protects creditors from deterioration of their rights during the pendency of a plan while providing debtors with an opportunity to reorganize their affairs.

Having abandoned any pretense of having commission income to support her plan, Amended Schedule I, Debtor has identified a new source of funding. Disingenuously expressed as "payments by a cleaning service," the contribution is rather from Haughton,"a friend," not from a business for which she performs services.[14] In support of this source of plan funding, she presented a letter signed by Haughton that states that he has committed to comply with the terms and conditions of her plan presented at the bankruptcy hearing on November 6, 2007 (i.e., the Eighth Amended Plan) which he has read. Unfortunately for her case, Haughton's offer bears little resemblance to the Debtor's averment that he will pay $1,000 monthly. On the contrary, he states that he "will contribute fifty percent of the amount proposed in the plan." Debtor had no explanation for the

---

[14] Presumably the friend is deriving the funds from his business with which Debtor has no connection. The facade that it was a payment from the cleaning service was maintained with the documentary support provided on the typed letterhead of the business. Exhibit D- 5. Why the Debtor felt the need to obfuscate on this point is not clear. Why not material to the outcome here, it evidences the Debtor's lack of candor with the court.

-14-

disconnect between the letter and her testimony nor was Haughton brought to the hearing to explain. Since I cannot conclude that Haughton either has committed $1,000 monthly to fund the Amended Ninth Plan and since I know nothing about him or his resources to determine whether he has the ability or will to contribute to the plan, I give no credence to this testimony. Moreover, Debtor's uncorroborated statement that she has received two payments of $1,000 each for November and December is belied by her failure to pay any of the current mortgages and the Trustee.

Clearly the $1,000 allegedly promised to her each month is necessary to the feasibility of the proposed modification. According to her most recent Schedules, Debtor's monthly expenses aggregate $4,235 while her rental income is $4,000. Without the contribution, her plan is simply not feasible even assuming the stability of her rentals. Since she has not sustained her burden of demonstrating sufficient income to make the proposed plan payments, the modification is not feasible.

The Trustee objects to the proposed modification, pointing out that the Sixth Amended Plan was only confirmed after many hearings and many amended plans. She notes that Debtor's reorganization has been a "moving target" of serial amended plans with no end in sight. Given Debtor's view of the liberality of the amendment process, I quite agree that the inevitable default will be met with yet another amended plan. That has been the modus operandi to date. Debtor has been given substantial leeway in this case and unfortunately rather than appreciate the patience and accommodation she has received, has been emboldened to conclude that there are no limits to plan modification. While she could have sold one or more of her other investment properties she has not done so, indicating that she

-15-

is still toying with this process. Rather she wants to hold off her mortgagees by paying arrears over 48 months although she claims to have had rental income to have paid them currently. I find that delay unreasonable. She has provided no evidence that there is equity in these properties, and indeed her Schedules appear to suggest otherwise. Delay puts her creditors further at risk. The unreasonable delay of her proposal and her failure to make current payments run afoul of § 1325(b)(5). While that conclusion alone supports denial of the Motion, her modification also fails because it is simply not feasible and in questionable good faith as discussed above. Lastly, while she contends that the defaults that give rise to the need for modification were occasioned by the loss of tenant income, she has not proven that to be so. It is possible that the shortfall in plan funding due to the insufficient proceeds from Darby was unforeseen, but the addition of the mortgage arrears and Trustee arrears to the Ninth Amended Plan arise from no change of circumstance but simply a breach of performance for which modification is not the cure.

      For the foregoing reasons, I will not approve the Modification Motion. Moreover, as Debtor has proffered nine amended plans, I will not allow further modification. Debtor has had ample opportunity to propose a workable plan but has insisted to this date on holding on to her investment properties other than Darby and stone-walling her mortgagees. There comes a time in this process when a debtor runs out of chances. To date, the Chapter 13 trustee and her mortgagees have given her leeway, as witnessed by the excessive number of amended plans and continued confirmation and dismissal hearings. They are understandably no longer agreeable given the absence of any indication that the pattern will change.

The Trustee has a pending motion to dismiss which has been carried to allow consideration of this last request for plan modification. Section 1307(c) identifies the grounds for dismissal implicit in the above analysis. In short, I have found unreasonable delay prejudicial to creditors, § 1307(c)(1) and material default with respect to the payment terms of the Confirmed Plan, § 1307(c)(6). Moreover, I have rejected the Debtor's latest proposed modification and will not allow another modified plan. There is absolutely no reason to grant the Debtor yet more time, and thus this case is properly dismissed.

An Order consistent with the foregoing Memorandum Opinion shall be entered.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated: January 18, 2008

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| JAMILAH PERRY, | : | Bankruptcy No. 06-14777DWS |
| aka Jamilah Lawrence, | : | |
| | : | |
| Debtor. | : | |

# ORDER

**AND NOW**, this 18th day of January 2008, upon consideration of (1) Debtor's Motion to Amend Plan Post-Confirmation ("Modification Motion"); (2) Motion for Relief from Stay ("Relief Motion") filed by Countrywide Home Loans, Inc., and (3) the Chapter 13 trustee's Motion to Dismiss ("Dismiss Motion"), after notice and hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that:

1. The Modification Motion is **DENIED**;

2. The Dismissal Motion is **GRANTED**, and the Chapter 13 case is hereby **DISMISSED**;

3. The Relief Motion is **MOOT**.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge
